United States District Court
For the Northern District of California

1

2

3

4

5

6

7      UNITED STATES DISTRICT COURT

8      NORTHERN DISTRICT OF CALIFORNIA

9

10     RONALD DEAN YANDELL,                    No. C 06-6332 MHP (PR)

11            Petitioner,                       **ORDER DENYING PETITION FOR
                                                WRIT OF HABEAS CORPUS**
12         v.

13     R. HOREL, Warden,

14            Respondent.
                                        /
15

16                          **INTRODUCTION**

17         This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C.

18     § 2254.  For the reasons set forth below, the petition is DENIED.

19                          **BACKGROUND**

20         In 2004, a Contra Costa Superior Court jury found Petitioner guilty of first degree

21     murder and voluntary manslaughter.[1]  The trial court sentenced Petitioner to sixty-five years

22     to life in state prison.  The California Court of Appeal for the First Appellate District

23     affirmed the judgment.  (Ans., Ex. 7 at 1.)  The California Supreme Court denied his

24     petitions for review and writ of habeas corpus.  (Id., Exs. 9 & 10.)  The Contra Costa

25     Superior Court denied his habeas petition, id., Ex. 18, and Petitioner's motion for post-

26     conviction DNA testing, id. Ex. 13.

27         Evidence presented at trial showed that in 2001 Petitioner shot three men, resulting in

28     the deaths of two of them.  The state appellate court summarized the facts as follows:

Peter Gutierrez (Peter) testified that at about 11:00 p.m. on May 13, 2001, he and his uncle, Mark Gutierrez (Mark), were watching television in the family room of their El Sobrante home before going to bed. Rob Laster, Dino (Peter's uncle), Bedwell and [Petitioner] were in the living room.[2] When Laster had arrived earlier in the day he carried a handgun and wore a bulletproof vest. Because Peter did not like or trust Laster, he went to bed armed with a dagger and brass knuckles. About 10 minutes after Mark left the room, and while Peter lay in bed, Peter heard what sounded like Dino and Laster wrestling over a gun. Peter then heard Laster laugh and heard about four gunshots being fired from the back part of the house. Dino ran into Peter's room, stared at Peter and then slumped back and fell to the floor. Peter then saw Laster get shot twice in the back while Laster was running from the living room to the back part of the house. Peter then saw Bedwell unable to walk, trying to scoot himself backwards from the living room area into the kitchen. Peter heard two more shots fired after which he heard Dino's brother, Mark, yelling his (Peter's) name. Peter and Mark then began fighting with [Petitioner] whom they ultimately subdued. On cross-examination, Peter admitted he did not see who shot Dino or Bedwell.

Mark testified that at about 11:00 p.m., when he left Peter's room to go to bed, Laster, Dino, Bedwell and [Petitioner] were in the living room. Shortly after he lay down, Mark heard a gunshot and jumped up to exit the room. As he stood by his closed door, Mark thought he heard Laster say, "Ronnie, Ronnie, don't," followed by two more gunshots. When Mark opened the door he saw Bedwell scooting backwards on the ground toward the kitchen saying, "Ronnie, you don't have to do this." Mark then saw Bedwell get shot twice more. Mark then attacked the shooter, later identified as [Petitioner], and yelled for Peter to help. With Peter's help, Mark wrestled the gun out of [Petitioner]'s hand and began beating him with it. After [Petitioner] was subdued, Mark called 911. He then saw Dino lying dead. Mark then threw the gun down in the living room and went outside to wait for the police. Mark identified the gun, a .357 Magnum, as belonging to Rob [Laster]. Mark said he did not know who shot Dino or where Dino was shot.

Contra Costa County Deputy Sheriff Craig Jimenez was dispatched to the shooting scene. Mark, appearing upset and agitated, came out of the house and yelled, "I'm the victim here. The guy who did the shooting is inside. I beat the fuck out of him and threw the pistol across the room." He also said that Mark said "the guy I beat up shot my brother." Shortly after Mark was taken into custody, Peter came out of the house, looking upset and holding an axe handle above his head. Peter was then taken into custody. Later, while standing outside the patrol car Mark said, "That dude on the kitchen floor isn't shot. I pistol whipped him. I beat the fuck out of him. I hope he dies. He shot my brother. I was trying to kill him. I pistol whipped that motherfucker and threw the gun in the living room." In a subsequent videotaped statement Mark told police that he attacked the person who he saw do the shooting. Several times Mark also said that he did not think that it was Laster that he beat up.

When Jimenez entered the house he saw [Petitioner], who appeared to have major injuries to his head and face, lying on the kitchen floor. Dino was found dead inside the family room, and Bedwell was found lying dead in the doorway between the family room and living room. Laster was not at the Gutierrez house when the police arrived.

Criminalist Alex Taflya recovered the .357 Magnum revolver from the living room. Firearms expert Kenneth Fujii opined that the bullet recovered from Bedwell's body was fired from the recovered gun. He said that although the bullet recovered from Dino had "matching detail" with the recovered gun, there was not enough matching detail to determine whether the bullet recovered from Dino was also fired from that gun because of damage to the bullet. Fujii said that the matching detail was "slightly less" than that necessary to conclude that the bullet recovered from Dino was probably fired from the recovered gun.

The autopsy of Dino revealed a blunt force injury to his head and a fatal gunshot wound to his upper chest. The autopsy of Bedwell revealed three gunshot wounds. The gunshot wounds were to his left leg, chest, and torso. The gunshot wound to the torso was a fatal wound that could have been suffered while Bedwell was scooting back and the shooter was standing and firing down at him.

Defense counsel argued during closing argument that Laster used his own gun to kill Dino and Bedwell when he panicked during a drug deal gone awry.

(Ans., Ex. 7 at 1–3) (footnotes removed).

As grounds for federal habeas relief, Petitioner alleges that (1) his right to due process was violated because there was insufficient evidence to support the murder and manslaughter convictions, (2) his right to due process was violated by the trial court's exclusion of impeachment evidence regarding witness Mark Gutierrez, (3) his right to effective assistance of counsel was violated by defense counsel's deficiencies identified in the petition, (4) his rights to due process and fair trial were violated by police and prosecutorial misconduct, and (5) his right to due process was violated when the state court wrongfully denied his request for DNA testing.

### STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision

1   that was based on an unreasonable determination of the facts in light of the evidence

2   presented in the State court proceeding."  28 U.S.C. § 2254(d).

3        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

4   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

5   law or if the state court decides a case differently than [the] Court has on a set of materially

6   indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000).

7        "Under the 'unreasonable application' clause, a federal habeas court may grant the

8   writ if the state court identifies the correct governing legal principle from [the] Court's

9   decision but unreasonably applies that principle to the facts of the prisoner's case."  Id. at

10   413.  "[A] federal habeas court may not issue the writ simply because that court concludes in

11   its independent judgment that the relevant state-court decision applied clearly established

12   federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

13   Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask

14   whether the state court's application of clearly established federal law was "objectively

15   unreasonable."  Id. at 409.

16                                    **DISCUSSION**

17   **1.      Sufficiency of the Evidence**

18        Petitioner claims that there was insufficient evidence to support the murder and

19   manslaughter convictions because the two witnesses to the shootings, Peter and Mark

20   Gutierrez, provided weak evidence or were not credible.[3]  (Pet. at 12.)  Peter's evidence,

21   according to Petitioner, was quite weak.  Peter, according to Petitioner, testified that he never

22   saw who shot Dino or Joey, that Petitioner had been friendly that evening, and that Petitioner

23   was asleep on the sofa prior to the shootings.  (Id.)  Mark's testimony, Petitioner asserts, was

24   not credible.  According to Petitioner, Mark testified at trial that Joey had cried out "Ronnie,"

25   an event Mark never mentioned in his original statement to police.  (Id. at 3.)  Petitioner also

26   avers that Mark testified that he engaged in routine drug use, and that he was smoking

27   methamphetamine on the day of the shooting.[4]  (Id. at 2–3.)

28

**United States District Court**
For the Northern District of California

4

United States District Court
For the Northern District of California

The state appellate court addressed only Petitioner's claim regarding the manslaughter conviction.  That court summarized the evidence supportive of the manslaughter charge:

> Just prior to Peter and Mark hearing gunshots, [Petitioner] was seated in the living room with Dino, Bedwell and Laster.  After Peter heard gunshots, Dino came into his room then slumped and fell down dead.  Peter then saw Laster get shot as he (Laster) ran from the living room.  Peter then saw Bedwell, unable to walk, trying to scoot himself away from the living room.  Mark said that after hearing a gunshot he heard Laster say, "Ronnie, Ronnie don't" followed by two more gunshots.  He then saw Bedwell scooting backwards toward the kitchen, saying "Ronnie, you don't have to do this."  Mark then saw [Petitioner] shoot Bedwell twice more.  With Peter's help Mark wrestled the gun from [Petitioner]'s hand.  After Dino was shot, Laster was seen fleeing gunshots and saying, "Ronnie, Ronnie, don't," permitting the initial inference that either [Petitioner] or Bedwell shot Laster.  Then, after Bedwell was scooting on the ground saying, "Ronnie, you don't have to do this," [Petitioner] shot him two more times.  Based on the pleas by both Bedwell and Laster to [Petitioner], the jury could reasonably conclude that [Petitioner] was the lone gunman, who initially shot Dino and then shot Laster and Bedwell.  The absence of any evidence that [Petitioner] came to the Gutierrez house armed with a handgun, or had a motive to shoot and kill Dino, the fact that Laster wore a bulletproof vest and was armed with a handgun while at the Gutierrez home, and issues of credibility regarding Peter and Mark were all factual issues for resolution by the jury, not the reviewing court.  It was within the jury's province to resolve those issues and the evidence before it against [Petitioner].

(Ans., Ex. 7 at 4–5.)

Petitioner challenges the credibility of Mark's testimony and strength of Peter's, not whether the elements of the crimes were supported by sufficient evidence.  A jury's credibility determinations are entitled to near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  If confronted by a record that supports conflicting inferences, a federal habeas court "must presume — even if it does not affirmatively appear on the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson v. Virginia, 443 U.S. 307, 326 (1979).

Petitioner has not shown that he is entitled to habeas relief on this claim.  Firstly, there was strong evidence of Petitioner's guilt.  As the state appellate court pointed out, Peter testified that he saw Dino, Bedwell and Laster either with bullet wounds, being shot, or exiting the living room in an attempt to avoid being shot.  As Petitioner was the only remaining person in the living room, a reasonable juror could find that Petitioner was the

shooter.

Secondly, Petitioner's insufficiency claim based on Mark's lack of credibility is without merit. What Petitioner voices is a disagreement with the jury's credibility determination, which is an insufficient reason to warrant habeas relief. As stated above, this Court must accord the jury's credibility determination great deference. See Bruce, 376 F.3d at 957. The jury believed Mark, despite the evidence that undercut his credibility. Specifically, the jury heard testimony from Mark himself that he was a drug-taker who had smoked methamphetamine on the day of the shooting. (Ans., Ex. 2, Vol. 3 at 395–96.) The jury also heard Mark testify that he was not sure whether he told the police during his first interview that he heard Laster call out "Ronnie." (Id. at 460–61.) This Court must presume that the jury considered and rejected these credibility concerns in favor of the prosecution. See Jackson, 443 U.S. at 307. Accordingly, Petitioner's claim is DENIED.

**2.      Exclusion of Impeachment Evidence**

Petitioner has withdrawn this claim. (Trav. at 5.) Accordingly, this claim is deemed waived.

**3.      Assistance of Defense Counsel**

Petitioner claims that defense counsel rendered ineffective assistance by failing to (a) have physical evidence tested; (b) call an expert witness to discuss the psychological effects of methamphetamine on Mark Gutierrez's ability to recall events; (c) allow petitioner to testify on his own behalf; (d) call Mark Gutierrez's co-workers as witnesses; (e) challenge the trial court's ruling which denied the defense motion to set aside the information; (f) call a forensic expert on behalf of the defense; (g) impeach Mark Gutierrez with the 1976 petty theft prior; and (h) impeach Mark Gutierrez at trial with his preliminary hearing testimony that he routinely smoked methamphetamine. The state appellate court did not address these claims in its written opinion.

Claims of ineffective assistance of counsel are examined under Strickland v. Washington, 466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of

United States District Court
For the Northern District of California

counsel, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687–68. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot establish incompetence under the first prong. See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

### A.    Testing of Physical Evidence

Petitioner contends that defense counsel failed to have crucial physical evidence — hair strands and blood stains — tested for their DNA signatures. (Pet. at 8.) With regard to the first bit of evidence, investigators found two blond hairs on Dino Gutierrez's body, one clutched in his hand, the other on his chest. With regard to the second bit of evidence, Dino had blood stains on his hands. Petitioner, whose head was shaved bare at the time the crimes were committed, contends that defense counsel's failure to obtain the DNA signatures from the hair and blood deprived Petitioner of a constitutionally adequate defense. In particular, the evidence could have, in Petitioner's opinion, corroborated Peter's testimony that Dino struggled with a person other than Petitioner for possession of the gun.

The state superior court twice rejected this claim. In denying the state habeas petition, the superior court declared that "DNA testing would have been useless" because "the evidence of guilt was overwhelming." (Ans., Ex. 18 at 3.) After a hearing on Petitioner's post-conviction motion for DNA testing, the superior court determined that Petitioner had not

United States District Court
For the Northern District of California

1    shown a "reasonable probability for granting his motion." (Id., Ex. 13.)

2        This Court cannot say that Petitioner suffered prejudice.  First, the blood found on

3    Dino was tested and identified as his own. (Pet., Ex. D at 2.)  Second, even if the hair and

4    blood were not Petitioner's, such evidence would show only that the victims came into

5    contact with the hair and blood of person who was not Petitioner. (For example, the hairs

6    may have been present in the living room at any time prior to the shooting, and may have

7    clung to Dino during the melée.)  Such evidence is clearly outweighed by the significant

8    eyewitness evidence, recited above, that Petitioner shot the victims.  On such a record,

9    Petitioner has not demonstrated that he suffered prejudice by defense counsel's actions.

10   Accordingly, Petitioner's claim is DENIED.

11       **B.    Expert Witness**

12       Petitioner claims that defense counsel's failure to call an expert witness to discuss the

13   psychological effects of methamphetamine on Mark's ability to recall events resulted in

14   prejudice. (Pet. at 10.)

15       Where the evidence does not warrant it, the failure to call an expert does not amount

16   to ineffective assistance of counsel.  See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999)

17   (a decision not to pursue testimony by a psychiatric expert is not unreasonable when the

18   evidence does not raise the possibility of a strong mental state defense).

19       Petitioner is not entitled to habeas relief on this claim because the evidence did not

20   require an expert's explanation in order for the jury to understand it.  Mark testified that he

21   used drugs on the day of the crime, and admitted that his recollection of some details was not

22   clear. (Ans., Ex. 2, Vol. 3 at 460–61.)  Also, defense counsel closely cross-examined Mark

23   on his ability to recollect events. (Id. at 404–09.)  As the jury was aware that Mark had

24   difficulty in recollecting events and had used drugs, Petitioner has not shown that he suffered

25   prejudice by defense counsel's not having called an expert witness.  Accordingly, Petitioner's

26   claim is DENIED.

27

28

**C.      Testifying**

Petitioner has withdrawn this claim.  (Trav. at 9–10.)  Accordingly, this claim is deemed waived.

**D.      Calling Witnesses**

Petitioner claims that trial counsel rendered ineffective assistance when he failed to call Mark Gutierrez's co-workers as witnesses.  (Pet. at 22.)  In support of this claim, Petitioner has submitted an affidavit signed by Johnny Cline, Mark's former co-worker.  In this affidavit, Cline avers that

> I heard that Mark would testify that he saw someone get shot at his home the night his brother died.  However[,] in the interest of justice, it should be known that Mark told me, 'that he had not seen any one [sic] get shot.'  I do not know why Mark was willing to testify other wise [sic].  I did not ask for any explanation to his statement, nor was any given.  I contacted the defendant[']s [a]ttorney, Colin Cooper.  I made Mr. Cooper aware of the statement that Mark made to me.  However, I was not contacted by [a]ttorney Cooper after I spoke with him initially.

(Id., Ex. C at 2.)

Petitioner has not shown that he is entitled to habeas relief on this claim.  Assuming, arguendo, that Cline had testified and had been believed, Petitioner has not shown prejudice, especially considering the strength of Peter's evidence.

**E.      Challenging the Trial Court's Ruling**

Petitioner claims that defense counsel rendered ineffective assistance when he failed "to appeal [the trial court's] denial of Petitioner's 995 motion [to dismiss the information][5] even when the trial judge acknowledged there was no evidence against Petitioner."  (Pet. at 11.)

Contrary to Petitioner's assertion, the trial court did not state that there was no evidence against Petitioner.  Rather, the trial court stated that there was no evidence justifying the giving of an instruction on self-defense or involuntary manslaughter.  (Ans., Ex. 2, Vol. 4 at 669–676.)

9

**United States District Court**
For the Northern District of California

1    Petitioner is not entitled to habeas relief on this claim.  Simply put, his claim was

2    based on a misapprehension of the trial court's statement.  As he has not articulated any other

3    basis for his allegation, Petitioner's claim is DENIED.

4         **F.    Forensic Expert**

5         Petitioner claims that defense counsel rendered ineffective assistance when he failed

6    to call a forensic expert.  (Pet. at 12.)  Petitioner bases his claim on an alleged discrepancy

7    between Mark's testimony and that of the pathologist.  According to Petitioner, Mark

8    testified that Bedwell "was scooting backward[s] on his butt when shot, and had both hand[s]

9    palm down on the floor using them in successive motion to move his body backward[s]."

10   Petitioner asserts that Mark's assertion is at odds with the testimony of the pathologist, who

11   stated that Bedwell suffered three gunshot wounds — one in his back left leg as he was

12   facing away from the shooter, one in his torso caused by a shot to the front that travelled

13   through to his back, and the third in the back hip that travelled upward through Bedwell's

14   body at a forty-five degree angle.  (Id.)

15        Expert testimony is necessary when lay persons are unable to make an informed

16   judgment without the benefit of such testimony.  See Caro v. Calderon, 165 F.3d 1223, 1227

17   (9th Cir. 1999).  Where the evidence does not warrant it, the failure to call an expert does not

18   amount to ineffective assistance of counsel.  See Wilson, 185 F.3d at 990.

19        Petitioner has not shown that the evidence warranted an explanation by a forensic

20   expert, and therefore has not shown that he is entitled to habeas relief on this claim.  Reading

21   Petitioner's claim broadly, Petitioner asserts that a forensic expert would have shown that

22   Bedwell's having been shot twice in the back of his body, and only once in his front, was at

23   odds with Mark's testimony that he saw Bedwell scooting backwards while facing the

24   shooter.  First, such clear facts do not require explanation by a forensic expert.  Second, these

25   facts are not at odds with Mark's testimony — Bedwell could have received the shots in his

26   backside before Mark saw him moving away from the shooter.  Also, the bullet that caused

27   the torso wound travelled from front to back, a fact which actually supports Mark's

28

10

United States District Court

For the Northern District of California

1

testimony.  Not having made the requisite showing, the Court DENIES Petitioner's claim.

2

**G. & H.**        **Failure to Impeach Mark Gutierrez**

3

Petitioner claims that defense counsel rendered ineffective assistance when he failed

4

to impeach Mark Gutierrez with the 1976 petty theft prior conviction, and with the fact that

5

Mark admittedly smoked methamphetamine.  (Pet. at 12.)

6

Petitioner has not shown that defense counsel's performance was deficient, nor that

7

such alleged deficiency resulted in prejudice.  Defense counsel adequately impeached Mark,

8

even without raising the issue of his prior conviction.  Specifically, the record shows that

9

defense counsel questioned Mark regarding his ability to recall events.  (Ans., Ex. 2, Vol. 3 at

10

404–09.)  Defense counsel also raised the issue of Mark's methamphetamine use.  (Id. at

11

404–05.)  Furthermore, it is unlikely that the presentation of evidence of an old (1976)

12

conviction for a relatively minor crime would have had much, if any, impeachment effect.

13

On this record, the Court concludes that defense counsel adequately attempted to impeach

14

Mark such that counsel's omission of Mark's prior conviction did not appreciably detract

15

from the quality of counsel's performance.

16

Petitioner has likewise been unable to demonstrate prejudice.  Sufficient evidence of

17

Petitioner's guilt had been presented through Peter's testimony.  Even if Mark's testimony

18

had been entirely discredited, Peter's testimony eliminates a reasonable probability that the

19

outcome of the proceeding would have been different.  Accordingly, Petitioner's claim is

20

DENIED.

21

**4.**        **Alleged Police and Prosecutorial Misconduct**

22

Petitioner alleges that the police and prosecution engaged in various forms of

23

misconduct.  (Pet. at 14.)  With respect to the police investigation, Petitioner asserts that the

24

police committed misconduct by (1) engaging in "suggestive questioning" when they

25

interrogated Mark, (2) failing to collect two bags of white powder, blood-stained rugs and

26

clothing, and blood trail evidence from the crime scene, (3) presenting misleading evidence

27

regarding the provenance and trajectory of a bullet, (4) failing to test a bullet casing for

28

fingerprints, and (5) failing to collect Mark's alleged drug pipe. (Id. at 14–17, 19.)  With respect to the prosecution, Petitioner contends that the prosecutor engaged in misconduct by presenting the false bullet trajectory evidence, and by suppressing evidence regarding the number of shots fired. (Id. at 17–21.)

### A.    Alleged Police Misconduct

#### 1.    "Suggestive Questioning"

Here, Petitioner avers only that the police engaged in "suggestive questioning" during its interrogation of Mark "by telling him to forget other[]s, and to focus solely on Petitioner." (Pet. at 25.)

Petitioner's claim fails.  Firstly, Petitioner contends only that the police engaged in suggestive questioning, not that Mark in fact testified inaccurately because of such questioning.  An indication that Mark did not testify inaccurately because of such questioning is that his testimony was largely corroborated by Peter's.  This conclusion relates to the second reason Petitioner's claim fails, which is that Petitioner has not shown prejudice.  Peter provided strong eyewitness evidence supportive of Petitioner's guilt.  Had Mark's testimony been improperly influenced, Peter's remained free of such influence, and provided significant independent evidence of Petitioner's guilt.  Accordingly, Petitioner's claim is DENIED.

#### 2.    Failure to Collect Evidence

Petitioner's claim fails.  Firstly, Petitioner has not stated how the white powder evidence may have been relevant to his defense.  The Court assumes that Petitioner believes the white evidence to have been drugs.  Evidence that the white powder was drugs — if that's what the powder was — would have been duplicative of Mark's testimony.  Mark had admitted to using drugs, and to using drugs on the day of the crime.  Secondly, Petitioner has not shown that the failure to collect blood-stained evidence resulted in prejudice.  Even if the blood evidence had been tested and shown the various blood paths at the crime scene, Petitioner has not shown beyond his suppositions that such evidence would undermine confidence in the jury's verdict.  As stated above, there was strong evidence of Petitioner's

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    guilt.  Peter testified that he saw Dino, Bedwell and Laster either with bullet wounds, being

2    shot, or exiting the living room in an attempt to avoid being shot.  As Petitioner was the only

3    remaining person in the living room, the evidence points to Petitioner as the shooter.  On

4    such a record, Petitioner's claim is denied.

5                       **3.      Bullet Trajectory Evidence**

6          Petitioner claims that the criminalist and the firearms expert, and, by extension, the

7    prosecutor, presented false testimony regarding a bullet's provenance and trajectory, thereby

8    violating Petitioner's due process right to a fair trial.  (Pet. at 15.)  At trial, the criminalist

9    testified regarding his bullet trajectory diagram.  This diagram was based on a bullet

10   recovered from a brown sofa at the crime scene.  (Id. at 16.)  According to Petitioner, this

11   testimony contradicts an assertion by the criminalist at the preliminary hearing that the shot

12   was fired from the livingroom doorway.  (Id.)  According to Petitioner, when confronted by

13   this contradiction at trial, the criminalist admitted that he did not know exactly from where

14   the bullet was fired.  (Id.)

15         Petitioner misstates the criminalist's testimony, which was only seemingly

16   contradictory, as the following quotation from the trial transcript indicates:

17         What I was trying to say in that sentence[ ] is the general direction from where
           the bullet came.  It was from an angle that was coming from the general
18         vicinity of the — of the — northwest of the vinyl couch.  And to say that it was
           coming from a direction of the doorway, would in my opinion, in the report
19         would make it easier for somebody to understand that it was coming from that
           angle.  I didn't necessarily determine exactly where it had come from.
20

21   (Ans., Ex. 2, Vol. 4 at 623–24.)

22         The record does not support Petitioner's assertion that the criminalist or the prosecutor

23   presented false evidence.  As there is no evidentiary basis for this claim, it is DENIED.

24                       **4.      Fingerprints**

25         Petitioner claims that the police committed misconduct by failing to have an unfired

26   .357 cartridge found at the crime scene tested for fingerprints.  (Pet. at 17.)  Petitioner

27   contends that it was found in Laster's bedroom.  (Id.)  According to Petitioner, the police,

28

1  knowing that Petitioner's fingerprints were not on the casing, did not have the bullet tested

2  for fingerprints.  (Id.)  Such evidence, in combination with the allegation that Petitioner was

3  never in Laster's bedroom, was "key evidence" suppressed by the police, according to

4  Petitioner.  (Id. at 18.)

5      Petitioner has not shown how such evidence overcomes the strong evidence of his

6  guilt presented at trial.  That an unused cartridge was found in a bedroom does not

7  significantly detract from the powerful testimonial evidence offered by Peter and Mark.  The

8  bullet in question could have appeared in the bedroom under any number of circumstances

9  unrelated to the circumstances of the crime.  Though the results of testing would have been

10  of some interest, this Court cannot say that the failure to test the bullet for fingerprints creates

11  the reasonable probability that the outcome of the proceeding would have been different.

12  Accordingly, Petitioner's claim is DENIED.

13      **5.      Testing of Mark's Pipe**

14      Petitioner faults the police for failing to have Mark's alleged drug pipe tested.  (Pet. at

15  19.)  Petitioner has not shown that the pipe evidence was significant.  Mark had informed the

16  jury that he often smoked methamphetamine, and did in fact smoke that drug on the day of

17  the crime.  That fact having been established, it is unclear what further value testing Mark's

18  drug pipe would have obtained.  On such a record, the Court concludes that Petitioner has not

19  shown that his constitutional rights were violated.  Accordingly, Petitioner's claim is

20  DENIED.

21      **B.      Alleged Prosecutorial Misconduct**

22      The Court construes Petitioner's prosecutorial misconduct claim as a claim that the

23  government suppressed evidence favorable to the defense.  The government has an obligation

24  to surrender favorable evidence that is "material either to guilt or to punishment," even if the

25  defendant does not request disclosure of such evidence.  Brady v. Maryland, 373 U.S. 83, 87

26  (1963); U.S v. Agars, 427 U.S. 97, 107 (1976).  Such evidence includes impeachment

27  evidence.  U.S. v. Bailey, 473 U.S. 667, 676 (1985).  To establish a Brady violation, the

28

14

defendant must show that exculpatory or impeaching evidence was suppressed by the state, either willfully or inadvertently, resulting in prejudice.  Morris v. Aalst, 447 F.3d 735, 741 (9th Cir. 2006).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  Bailey, 473 U.S. at 682.  The suppressed evidence need not be sufficient to affirmatively prove the defendant innocent; it need only be favorable and material.  Gantt v. Roe, 389 F.3d 908, 912 (9th Cir. 2004).

Petitioner claims the prosecution engaged in unconstitutional conduct when it presented false bullet trajectory evidence, and by suppressing evidence regarding the number of shots fired.  The Court has addressed the merits of his claim regarding the bullet trajectory evidence.  On the same basis as articulated above, Petitioner's claim is DENIED.

Petitioner's second claim of prosecutorial misconduct relates to the number of shots fired at the crime scene.  According to Petitioner, the prosecution asserted that only five bullets had been fired, and that all five had been accounted for.  (Pet. at 19.)  Petitioner, however, contends that more than five bullets were fired, a contention supported by Peter's testimony that ten shots were fired, and that the police failed to investigate a second bullet hole discovered in Dino's bedroom wall.  (Id.)

The record does not support Petitioner's contention.  Peter's testimony on how many shots were fired was more ambiguous than Petitioner contends, as the following quotation shows:

> Peter:  "I can't tell you exactly how many shots went off that night, but it was a bunch."
>
> Prosecutor:  "What do you mean by a bunch?  You need to be more specific."
>
> Peter:  "No more than ten, but like seven, I would say.  I would say at least seven — six, seven to ten shots I heard.  It was just close quarters, everything can start echoing after a while."

United States District Court
For the Northern District of California

(Ans., Ex. 2, Vol. 2 at 211.)  As this quotation shows, Peter was unsure about the number of shots — at first he said he couldn't say, then he kept changing the number, and finally admitted that it was hard to tell the number because of the echoes.  Such evidence is too ambiguous to support Petitioner's contention that the prosecution failed to present all the gunshot evidence.

As to the bullethole in Dino's bedroom, Petitioner has submitted a copy of a Contra Costa Sheriff's Report regarding the hole.  (See Pet., Ex. G.)  The report states that "[i]t does not appear to be a recent gunshot, but I [the police investigator-author] intend to have the lab return and check the hole."  (Id.)

Petitioner has not shown that this evidence was significant to his defense.  The bullethole in Dino's bedroom, Petitioner asserts, corroborates Peter's testimony that up to ten shots were fired.  As discussed above, Peter was far from certain about the number of shots. Peter's unsureness greatly reduces the supposed corroborative effect of the bullethole evidence in Dino's bedroom.  In sum, Petitioner has not shown that the evidence was material or favorable.  On this evidence, the Court cannot say that the superior court's denial of Petitioner's claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner also contends that the prosecution failed to test whether a gun found in the bushes outside the house was used in the crime.  (Pet. at 29.)  Petitioner claims that this other gun could have been the weapon that fired the allegedly unidentified bullet found in Dino. (Id. at 29–30.)

Petitioner has not shown that he is entitled to habeas relief on this claim.  Specifically, Petitioner bases his claim on an allegedly "unidentified" bullet found in Dino.  Petitioner's description of the bullet as merely "unidentified" omits crucial details in the criminalist's testimony, as the following quotation shows:

> I could not determine that that bullet had been fired in the gun.  The general rifling characteristics agree.  There was matching detail, unique detail on the

United States District Court
For the Northern District of California

1

2

> bullet, but in my mind there was not enough detailed agreement to identify the bullet as having been fired in the gun. My conclusion was slightly less than an identification that the bullet had probably been fired in the evidence gun.

3   (Ans., Ex. 2, Vol. 4 at 713.) Although the criminalist's conclusion fell short of full

4   identification, such a shortfall was only "slightly less" than a full identification. Because

5   there was reasonable evidence on which a jury could conclude that the bullet found in Dino

6   came from the evidence gun, Petitioner has not shown that failure to test another gun — such

7   as the one found outside the house — resulted in prejudice.

8       Accordingly, Petitioner's claims are DENIED.

9   **5.   DNA Testing**

10       Petitioner claims that the trial court violated his right to due process when it denied his

11  post-trial request for DNA testing. (See Docket No. 29 at 1–2.) Petitioner states, without

12  elaboration, that the state court's denial was "wrongful." (Id. at 2.) As stated above, the

13  Contra Costa Superior Court denied Petitioner's post-conviction motion for DNA testing

14  after a hearing on such motion. (Ans., Ex. 13.) The motion was denied on grounds that

15  Petitioner had not shown a reasonable probability that the DNA evidence would have been

16  helpful to his defense. (Id.)

17       Petitioner has not shown that he is entitled to habeas relief on this claim. Firstly, there

18  is no substantive due process right to post-conviction access to the state's evidence for DNA

19  testing purposes. See District Attorney's Office for Third Judicial Dist. v. Osborne, __ U.S.

20  __, 129 S.Ct. 2308, 2316 (2009).

21       Secondly, however, if a state creates a statutory right for DNA testing of the state's

22  evidence, a petitioner has a limited federal procedural due process right to obtain such

23  evidence for testing. California Penal Code § 1405 provides an elaborate scheme under

24  which a person in prison may seek and obtain DNA testing of evidence. The Court

25  concludes that there is nothing constitutionally inadequate about the procedures California

26  has provided. In fact, California's procedures are similar to Alaska's, which were cited with

27  approval by the Supreme Court. See Osborne, __ U.S. at __, 129 S. Ct. at 2320–21.

28

**United States District Court**
For the Northern District of California

1   Specifically, California has established a non-waivable right to request DNA discovery, an

2   opportunity to be heard on the matter, and to have counsel appointed.  See Cal. Pen. Code

3   § 1405(b), (c) & (m).  The law also establishes criteria under which the court is to examine

4   the merits of the request, as well as the procedures for laboratory selection, cost-allocation,

5   and for further judicial review.  See id. § 1405(g) and (h).  The Court cannot say that the

6   statute, which provides many protections and establishes appropriate procedures, is

7   constitutionally inadequate.

8         Based on the above determinations, Petitioner's claim fails.  Not only has he no

9   substantive due process right to such testing, he has failed to articulate any basis for his claim

10  that he was denied his constitutionally protected procedural due process rights.  Accordingly,

11  Petitioner's claim is DENIED.

12                                   **CONCLUSION**

13        The petition is DENIED.  The state court's adjudication of the claim did not result in a

14  decision that was contrary to, or involved an unreasonable application of, clearly established

15  federal law, nor did it result in a decision that was based on an unreasonable determination of

16  the facts in light of the evidence presented in the state court proceeding.  Petitioner's request

17  for an evidentiary hearing (Pet. at 1) is likewise DENIED.

18        A certificate of appealability will not issue.  Reasonable jurists would not "find the

19  district court's assessment of the constitutional claims debatable or wrong."  Slack v.

20  McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from

21  the Court of Appeals.

22        The Clerk shall enter judgment in favor of Respondent and close the file.

23        **IT IS SO ORDERED**.

24  DATED:   April 21, 2010                          _____
                                                     MARILYN HALL PATEL
25                                                   United States District Judge

26

27

28

18

**NOTES**

1.  The jury found true an allegation that Petitioner personally used and discharged a firearm, thereby causing the death of Bedwell, <u>see</u> Cal. Pen. Code § 12022.53(d).  The jury also found true an allegation that Petitioner personally used a firearm in the commission of voluntary manslaughter, <u>see</u> <u>id.</u> § 12022.5(a).  (Ans., Ex. 1, Vol. 2 at 762–765.)

2.  For purposes of clarity, the Court will refer to the individual Gutierrezes by their first names, Peter, Mark, and Dino.

3.  Petitioner alleges that the trial court, after the presentation of the prosecution's case, stated that there was "no evidence against Petitioner."  (Pet. at 14.)  The record does not support this assertion.  The trial court's comments were rather that there was no evidence justifying the giving of an instruction on self-defense or involuntary manslaughter.  (Ans., Ex. 2, Vol. 4 at 669–676.)

4.  With respect to Mark, Petitioner contends that Mark testified that he never saw who shot Dino, and that he saw Joey's shooter only from behind.  (<u>Id.</u> at 13.)

5.  Under California law, the accused can move to set aside an information or indictment under California Code of Criminal Procedure § 995.